In the

# United States Court of Appeals
## For the Seventh Circuit

———————————

No. 23-2615

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

VINCENT STORME,

*Defendant-Appellant.*

———————————

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:20-cr-650-1 — **John Robert Blakey**, *Judge.*

———————————

SUBMITTED SEPTEMBER 11, 2023 — DECIDED OCTOBER 17, 2023

———————————

Before BRENNAN, SCUDDER, ST. EVE *Circuit Judges.*

PER CURIAM. Federal judges grapple every day with one of
the most common but consequential decisions in our criminal
justice system: whether to detain a defendant pending trial.
Those decisions occur pursuant to the Bail Reform Act, which
embodies a careful and complementary balance of procedural
and substantive protections for those accused of crime and
presumed innocent under the Constitution. Before us is Vin-
cent Storme's challenge to the district court's determination

to terminate his pretrial release and order him detained pending trial. Two factors complicate the appeal. Foremost, Storme suffers from mental illness and has attempted suicide three times, most recently threatening to take his life if the district court declined to dismiss his pending criminal charges. So we must consider the role suicide risk plays under the operative provisions of the Bail Reform Act. Also complicating this appeal is the choppy procedural path that this case has traveled in the district court. So we also take care to underscore the importance of the procedural safeguards Congress embedded within the Act. In the end, we affirm the district court's decision detaining Storme pending trial.

## I

Storme awaits trial on multiple charges of cyberstalking, 18 U.S.C. § 2261A(2), and unauthorized intrusion into a cell phone, 18 U.S.C. § 1030(a)(2). His indictment, and the criminal complaint leading to it, allege an extreme online campaign of harassment against three different women. The harassment entailed obsessive accusations and occasional physical stalking.

Following Storme's arrest in September 2020, a magistrate judge ordered him released on bond into the custody of his mother subject to conditions of curfew, psychiatric treatment, and restricted use of technology.

Storme's concerning and increasingly erratic behavior began almost immediately. The day after his release, he attempted suicide by overdosing on medication. In February 2021, Pretrial Services reported that Storme had not only violated his curfew over thirty times but had also been arrested in Arlington Heights, Illinois for allegedly stalking a

fourth ex-girlfriend by following her home in his car. The ex-girlfriend obtained a protective order against Storme.

Pretrial Services also relayed that Storme had begun abusing alcohol and was continuing to have suicidal ideation. On one occasion, Storme called his Pretrial Services officer from the shores of Lake Michigan, threatening to drown himself until the officer talked him down. Ultimately, the district court—then with a different judge presiding over Storme's case—opted to admonish Storme, prohibit him from contacting the ex-girlfriend, and require that he submit to substance abuse testing. But the district court did not revoke release. A few months later, Storme's mother left the Chicagoland area and moved to Virginia. The court did not appoint a new third-party custodian in her stead.

In July 2023, after Storme moved to dismiss a superseding indictment, Pretrial Services provided the district court with a report from Storme's therapist. The therapist expressed concern that Storme would kill himself if he thought the court might deny his motion to dismiss. (Storme contends that the charges seek to criminalize speech protected by the First Amendment.) In anticipation of a hearing on the motion, Storme began transferring assets to his mother—a sign of ongoing suicidal ideation. He also appeared multiple times in the district court to watch unrelated proceedings before his assigned judge, apparently in an attempt to learn how to predict the judge's ruling on the motion to dismiss the criminal charges. During the same period, Storme refused to discuss a safety plan with his therapist or Pretrial Services officer, instead continuing to hint ominously at his plans for self-harm.

On August 3, the day of the hearing, the district court heard argument but decided to reserve ruling on Storme's

motion to dismiss. At the close of the proceeding, and without advance notice, the court then revoked Storme's pretrial release and ordered him detained. The court did not make supporting findings or offer explanation, stating that it would do so in a future written order.

Upon being removed from the courtroom, Storme began slamming his head to the floor and urging the marshals to kill him. An hour later, while in a holding cell at the Metropolitan Correctional Center, he tried to hang himself with his t-shirt. A correctional officer intervened, leading to Storme being placed on suicide watch for 48 hours.

Storme's counsel—a very experienced and talented criminal defense lawyer—reacted to the district court's unexpected detention decision by promptly seeking our review. Troubled by the lack of any notice that bail would be revisited, opportunity to be heard, and findings in support of detention, we entered an order on August 8 directing that Storme be released within 24 hours unless the government filed a motion to revoke under 18 U.S.C. §§ 3145(a) or 3148(b).

The government complied. After a lengthy detention hearing on August 9, the district court granted its motion to revoke Storme's release. The district court found probable cause to believe that, while on release, Storme had both committed crimes and otherwise violated his release conditions, rendering him subject to detention. On the merits of the detention question, the district court agreed with the government that suicide was a form of flight within the meaning of the Bail Reform Act. The district court also determined that Storme's erratic behavior made him a potential danger to others that could not be adequately mitigated by additional release conditions.

Storme now appeals a second time, 18 U.S.C. § 3145(c), once again urging us to order his release. See FED. R. APP. P. 9(a).

## II

## A

The Bail Reform Act supplies the statutory framework for making pretrial release and detention decisions in criminal cases. Section 3148 authorizes judges to revoke prior release orders and remand defendants into custody under specific circumstances. Any such order must satisfy the two-part standard Congress delineated in § 3148(b). See *United States v. Wilks*, 15 F.4th 842, 848 (7th Cir. 2021).

*First*, the district court must make a threshold finding under § 3148(b)(1) that there exists either "probable cause to believe that the person committed a Federal, State, or local crime while on release" or "clear and convincing evidence that the person has violated any other condition of release."

*Second*, the district court must find that detention is necessary under § 3148(b)(2), meaning either that "there is no condition or combination of conditions of release that will assure that the person will not flee or pose a danger to the safety of any other person or the community" or that "the person is unlikely to abide by any condition or combination of conditions of release." In making this assessment, the court must consider the factors delineated in § 3142(g) that informed the initial detention or release decision.

B

1

The district court had sufficient cause to revoke Storme's detention under § 3148. As a threshold matter, Storme was subject to revocation because he met both alternative grounds in § 3148(b)(1). The record provides probable cause to believe Storme had committed crimes while on release, including (at the very least) felony stalking under Illinois law. See 720 ILCS 5/12-7.3. Although the state did not press charges in response to Storme's stalking of a fourth ex-girlfriend, probable cause requires only evidence "sufficient to warrant a prudent person in believing that the suspect has committed an offense." *United States v. Hammond*, 996 F.3d 374, 391 (7th Cir. 2021); accord *United States v. Gotti*, 794 F.2d 773, 777 (2d Cir. 1986) (holding that § 3148(b)(1) adopts this traditional definition). The record also provides clear and convincing evidence that Storme violated his curfew multiple times in 2020 and 2021.

Storme does not challenge either finding. He asserts only that those events are too dated and stale to support revocation of his pretrial release. We cannot agree. Although staleness is a relevant fact for a court to consider when deciding whether to revoke release, it presents no legal barrier to doing so. Congress included no revocation time limit within § 3148(b)(1). While the Bail Reform Act generally contemplates swift revocation, see 18 U.S.C. § 3142(h)(2)(B) (requiring that a release order inform the defendant of "the consequences of violating a condition of release, including the *immediate* issuance of a warrant for the person's arrest" (emphasis added)), it nowhere imposes consequences for delay. The absence of such a provision has led the Supreme Court to hold that a defendant should not be released solely because a judge or the

government violated even explicit time limits elsewhere in the Act. See *United States v. Montalvo-Murillo*, 495 U.S. 711, 716–17 (1990). We see no reason why an implicit deadline—if indeed one exists—should be more strictly enforced.

The cases Storme cites are not inconsistent with this interpretation. Read in context, the decisions treat delay as a non-dispositive factor informing whether revocation is appropriate in the totality of circumstances leading to the detention decision. See *United States v. Hamilton*, 708 F.2d 1412, 1415 (9th Cir. 1983) ("Three years is beyond that point under the circumstances of this case."); *United States v. Sciuto*, 531 F.2d 842, 847 (7th Cir. 1976) ("Whether the delay was unreasonable depends upon whether [the defendant] deceived the probation officer."). But § 3148(b)(1) merely asks whether a defendant is eligible for a revocation of pretrial release. Clear and convincing evidence of violations of release conditions establishes such eligibility and thereby exposes a defendant like Vincent Storme to the risk of pretrial detention.

2

Turning to the application of § 3148(b)(2), we do not believe that Storme's likelihood of violating release conditions is sufficiently high to justify detention. See 18 U.S.C. § 3148(b)(2)(B). Although Storme repeatedly violated curfew, each violation was only by a few minutes, and after the district court admonished him over two years ago, he never violated his curfew again. Indeed, before the district court ordered him detained on August 3, 2023, Storme had been released subject to conditions for nearly three years while generally remaining compliant. Based on the record before us, we cannot conclude that Storme is "unlikely to abide by any

condition or combination of conditions of release." *Id.* § 3148(b)(2)(B).

That brings us to a more difficult question: whether detaining Storme pending trial is necessary to "assure that the person will not flee or pose a danger to the safety of any other person or the community." *Id.* § 3148(b)(2)(A). We conclude that, although the mere existence of suicide risk is not itself sufficient to justify pretrial detention, the unique circumstances of this case nonetheless warrant detention. Storme's suicidal ideation, the district court reasonably determined, is but one manifestation of a broader pattern of erratic, obsessive, and unpredictable behavior presenting a danger to others.

Suicide risk is distinct from a risk of flight or nonappearance. The text of the Bail Reform Act provides no indication that the term "flight" encompasses suicide. To the contrary, the plain import of the term "flight" connotes an intentional act by a defendant to evade criminal prosecution by leaving the jurisdiction. See *United States v. Ailon-Ailon*, 875 F.3d 1334, 1337 (10th Cir. 2017) (concluding that immigration removal does not qualify as flight because flight must involve an element of volition). That explains why magistrate and district judges routinely impose travel restrictions and require defendants to surrender passports—all to mitigate the risk of flight. Common definitions of flight support this conclusion. See *Flee*, WEBSTER'S II NEW RIVERSIDE UNIVERSITY DICTIONARY (1984) ("To run away"); *Flee*, AMERICAN HERITAGE DICTIONARY (2d Coll. Ed. 1982) ("To run away from or as from danger"). And the Bail Reform Act's legislative history, to the extent it is relevant, provides no hint that Congress contemplated "flight by suicide" as a cognizable basis for detention.

The same goes for nonappearance. In the bail context, non-appearance refers to an attempt to avoid submitting to a court's jurisdiction, not to death. Judges "assure the appearance" of criminal defendants by imposing release conditions and adopting precautionary measures to prevent them from evading prosecution. But a defendant's death terminates a pending criminal proceeding "from its inception" as if charges had never been brought. See *United States v. Volpendesto*, 755 F.3d 448, 452–53 (7th Cir. 2014). The need to secure a defendant's appearance ceases to have meaning if a defendant dies and the criminal case terminates by operation of law.

Consider the practical implications of a contrary conclusion. If a defendant's death constituted a form of nonappearance, judges could detain upon a showing of a sufficient risk of death, including one created by age, poor health, or inadequate access to medical services. We have a difficult time seeing how Congress intended the Bail Reform Act to operate with such breadth.

### 3

Moving beyond flight and nonappearance, we turn to the question whether suicide risk alone poses a sufficient danger to justify detention. We hold that it cannot. The Act is clear that a revocation of pretrial release must be based on a risk to "the safety of any *other* person and the community." 18 U.S.C. § 3148(b)(2)(A) (emphasis added). By its terms, then, the statute requires a finding that the defendant's conduct poses a danger to some person *other* than themselves.

The government urges a broader construction, pointing to one of the § 3142(g) factors that judges must consider when

deciding whether to revoke pretrial release under § 3148. We recognize that Congress worded that factor in terms of "the danger to any person or the community," notably omitting the term "other" before person. But this language does not supply the operative standard for deciding whether detention is appropriate. It is simply one factor among many that a court should consider when evaluating what is the controlling standard: whether the defendant poses a risk to the "safety of any other person and the community." 18 U.S.C. § 3148(b)(2)(A). At best, therefore, § 3142(g) suggests that suicide risk is relevant only to the extent that it presents a risk of harm to others—for example, with a defendant who threatens to shoot himself and anyone else who seeks to monitor his whereabouts or well-being. But the mere risk of self-harm is not itself enough.

Congress's inclusion of the phrase "or the community" in § 3148(b)(2)(A) is consistent with our conclusion. It is well understood that harms to the "community" refer not to the defendant but to crimes without specific victims. See, *e.g.*, *United States v. Ramirez*, 843 F.2d 256, 257–58 (7th Cir. 1988) (applying the Bail Reform Act to vacate a release order based on evidence of a drug trafficking conspiracy that presents a danger to the community); *United States v. Munchel*, 991 F.3d 1273, 1283 (D.C. Cir.), *judgment entered*, 844 F. App'x 373 (D.C. Cir. 2021) (observing that a danger to a community need not be tied to a risk of physical violence to justify detention under the Bail Reform Act).

So we conclude that the mere existence of a risk of suicide does not provide grounds to detain a defendant under the Bail Reform Act in any and every case. But this is no routine case.

Revoking release based on dangerousness requires a careful assessment of the facts and circumstances relevant to the broad factors in 18 U.S.C. § 3142(g). See 18 U.S.C. § 3148(b)(2)(A) (directing courts to consider these factors when deciding whether to revoke release in light of flight risk or dangerousness). Considering those factors in totality, we agree with the district court that Storme's continued release would pose a danger to other persons or the community. The allegations against Storme paint a picture of a defendant who responds unexpectedly, dangerously, and obsessively to adversity in potentially escalatory ways. Shortly after Storme was charged with electronically stalking one ex-girlfriend, police arrested him for physically stalking another, even while he was under strict supervision. The facts identified by Pretrial Services leading to the August 3 hearing suggest that Storme's condition was worsening rapidly.

The evidence presented to the district court demonstrates that, as of at least July 2023, Storme was preparing for things to escalate again, whether through self-harm or some other unpredictable, desperate action that mere conditions of release could not prevent. By that point, Storme's mother had left the state, leaving him without a third-party custodian to help monitor him. For months, Storme came to the federal courthouse and sat through unrelated hearings conducted by his assigned judge in an attempt to predict how the court would rule on the pending motion to dismiss. Viewed in this light, his suicide threats created more than a mere risk of self-harm. Tied explicitly to his charges, they were essentially threats of unpredictable violence if the district court ruled against him.

The district court properly revoked Storme's detention on the ground that no conditions would assure that he does not pose a danger to the safety of other persons or the community.

## III

In the ordinary case, this conclusion would end our analysis. But this is not an ordinary case, in no small part because it traveled a rocky path to our court. In these circumstances, then, we close by underscoring the importance of adherence to the procedural protections Congress incorporated into the Bail Reform Act.

Recall that the district court concluded the August 3 hearing on Storme's motion to dismiss by revoking his pretrial release and ordering him detained pending trial. We have zero doubt the district court made the decision not only believing it legally sound but also grounded in the compassionate perspective that detaining Storme may save his life. By all measures, the record shows Storme to be suffering from grave mental illness, and the district court, upon learning from Pretrial Services that his suicidal ideation was intensifying, reacted by determining that detention may help bring important stability to an unpredictable and precarious situation.

If given the chance to redo the August 3 proceeding, we also have zero doubt the district court would have adhered more closely to the revocation process delineated in § 3148(b). The court could have done so by informing the parties of the recent findings of Pretrial Services and otherwise supplying advance notice (if only at the outset of the motion to dismiss hearing itself) that it was considering modifying Storme's release status. See 18 U.S.C. § 3153(c)(1) ("Each pretrial services report shall be made available to the attorney for the accused

and the attorney for the Government."); N. D. ILL. L. CRIM. R. 46.4(a) (requiring that attorneys receive any report "in connection with" detention, release, or modification proceedings). For its part, the government—as § 3148 contemplates—could have unambiguously moved to revoke Storme's release.

A process along those lines would have informed Storme that the district court was considering modifying his release while providing him sufficient opportunity to prepare for a hearing on the matter, as Congress has determined is essential to affording a defendant a full and fair opportunity to respond. See 18 U.S.C. § 3148(b) (stating that a revocation of a defendant's release must come after a "proceeding for revocation" that includes a "hearing"); *id.* § 3142(f) (stating that a defendant must have the opportunity to testify, cross-examine, and present witnesses at a detention hearing). Process matters with detention decisions precisely because it protects the liberty interest of persons presumed innocent under the Constitution. Or, as the Supreme Court has put the same point, "[i]n our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *United States v. Salerno*, 481 U.S. 739, 755 (1987).

Other aspects of the August 3 proceeding give us considerable pause too. The Bail Reform Act requires express findings to support even temporary detention decisions. See 18 U.S.C. § 3142(d) (permitting temporary detention of a person on release for up to 10 days if a judicial officer "determines that … such person may flee or pose a danger to any other person or the community"). The district court did not accompany its August 3 detention decision with such findings, understandably leading Storme's counsel to promptly seek our

review and leaving the government to file rushed and unclear motion papers requesting a more orderly revocation of Storme's pretrial release.

To the district court's credit, though, a formal detention hearing ensued promptly on August 9. The transcript of that proceeding is not easy to read, for it is clear that the circumstances leading to the hearing escalated everyone's anxiety and resulted in some tough exchanges of words. We make this observation believing with complete certainty that all involved—the government, Storme's counsel, the district court—were acting in the best of faith and working through the tense and difficult circumstances presented by Storme's ongoing mental illness and acute risk of suicide.

Our overarching point is not one of criticism but of positive reinforcement: sound process often matters most in pressure-packed, consequential decisions. Recognizing those moments and taking care to adhere to the requirements prescribed by rule or statute will ensure the protections of the parties' rights and interests and maximize the chances of clean transcripts containing clear findings and leaving no doubt everyone enjoyed a full and fair opportunity to convey their positions.

In the end, the district court reached the right conclusion. Before the court was a defendant suffering from mental illness and charged with very serious crimes marked by danger, obsession, and persistence. Twice before, Vincent Storme's mental illness manifested itself in unsuccessful suicide attempts, with Pretrial Services informing the district court that the suicidal ideation was only intensifying in anticipation of an adverse ruling on a pending motion to dismiss all criminal charges. Though scattered and disjointed in places, the record

supports the district court's conclusion that Storme's unpredictable and erratic pattern of behavior presented a danger to others sufficient to justify a revocation of his pretrial release.

For these reasons, we AFFIRM the district court's order revoking Storme's release from pretrial detention.